983 F.2d 1067
 142 L.R.R.M. (BNA) 2312
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
NTA GRAPHICS, INC., Respondent.
 No. 92-5083.
 United States Court of Appeals, Sixth Circuit.
 Jan. 12, 1993.
 
 Before KENNEDY, BOYCE F. MARTIN, JR. and SUHRHEINRICH, Circuit Judges.
 PER CURIAM:
 
 
 1
 The National Labor Relations Board ("NLRB") petitions for enforcement of its order against NTA Graphics, Inc. ("Company" or "Employer"), under Section 10(e) of the National Labor Relations Act, 29 U.S.C. § 160(e).[1] The NLRB found that the Company violated Sections 8(a)(1) and 8(a)(3) by firing for anti-union sentiment sixteen employees who refused to sign an employee handbook, by firing Michael Rogers, and by engaging in other acts of interference, restraint, and coercion. The Company asserts that these findings are not supported by substantial evidence. We find that the NLRB lacked substantial evidence for its finding in reference to the Company's firing of the sixteen employees who refused to sign the handbook. The NLRB's other conclusions were supported by substantial evidence. Accordingly, the NLRB's petition for enforcement of its order is DENIED in part and its order is ENFORCED in part.
 
 Standard of Review
 
 2
 Findings of fact by the NLRB are reviewed for whether they are supported by substantial evidence on the record as a whole. Universal Camera v. NLRB, 340 U.S. 474 (1951); Hyatt Corp. v. NLRB, 939 F.2d 361, 366 (6th Cir.1991). The application of the Act to facts also is reviewed for substantial evidence. Asarco, Inc., Tennessee Mines Div. v. NLRB, 805 F.2d 194, 196 (6th Cir.1986). Where the NLRB finds facts and draws inferences in conflict with those of the Administrative Law Judge ("ALJ"), the standard of review remains substantial evidence. Larand Leisurelies, Inc. v. NLRB, 523 F.2d 814, 820 (6th Cir.1975). In finding substantial evidence, however, "the reviewing court has an obligation to examine more carefully the evidence in cases where a conflict [between ALJ and NLRB] exists." Id. The standard of review for NLRB interpretation or construction of the Act is whether it is reasonably defensible. Ford Motor Company v. NLRB, 441 U.S. 488, 497-98 (1979).
 
 
 3
 We will consider the points of error asserted by the Company in turn. We note that for NLRB findings and conclusions not addressed by the Company, the right to object has effectively been waived. NLRB v. Valley Plaza, Inc., 715 F.2d 237, 240-41 (6th Cir.1983).
 
 Discharge of 16 Employees
 
 4
 The Company contends that the NLRB's finding that the Company violated Section 8(a)(3) by firing sixteen of its 55 employees in the week following a union organizing meeting is not supported by substantial evidence. The ALJ who heard evidence and whose factual findings were accepted by the NLRB found that Company operations manager David Tremonti called meetings for all employees on Thursday, May 28, 1987, at which he distributed employee handbooks. The ALJ found that these handbooks had been ordered in February, prior to any union activity. Each handbook included the statement that all employees were employed at will and contained an agreement to be signed by each employee stating that she or he had read, understood, and would abide by the Company rules contained in the handbook. Tremonti instructed the employees to read the handbooks and sign them before returning to work the next week. Tremonti did not at these meetings mention any penalty for failing to sign the handbooks. The union organizing meeting was held the following Saturday, May 30. Several Company supervisors attended this meeting.
 
 
 5
 Several employees reporting for a skeleton crew on Monday, June 1 were told by supervisor Scott Shaffer that they were required to sign the handbooks before they could work. When three employees refused to sign, they were sent home and were warned that failing to sign would result in termination. The same thing happened when ten employees reporting for the third shift on the same day refused to sign the handbooks. The next day, the number of first shift employees refusing to sign the books had increased to six. When told to go home and warned that failure to sign would result in termination, these six employees refused to leave until they had been provided written statements of discharge. Two hours later, they were escorted from the premises by police, who had been called by the Company.
 
 
 6
 On June 2, an emergency union meeting was held, at which employees were advised to sign the handbooks under protest. Following this meeting, Phil Rogers and Robert Miller told supervisor Scott Shaffer that they wished to sign their handbooks under protest. Shaffer allowed them to sign, stating that "As long as you sign [the handbooks,] you will work." On June 4 and 6, all 16 of the employees who had not signed the handbooks received letters of discharge.
 
 
 7
 The NLRB accepted without exception all of the witness credibility findings by the ALJ, but came to a contrary ultimate conclusion. The ALJ found that the employees had been legally fired for attempting to set their own terms of employment. The NLRB found that the Company's actions were motivated by anti-union animus and constituted retaliation against employees identified as pro-union. The NLRB stated that the Company's "reliance on the employee's refusal to sign the handbooks was merely a pretext for ridding itself of a group of known or suspected union supporters." The NLRB acknowledged, however, that "[t]here is no allegation that either the promulgation of the handbook or the requirement that the employees sign it violated the Act." Thus, the action of the Company which the NLRB found pretextual was the refusal to allow employees who did not sign the handbooks to work and their subsequent discharge. There is no direct evidence that the discharges were motivated by anything except the refusal to sign the handbooks. Indeed, the employees were not immediately discharged. Rather they were not permitted to work until they signed. The inference drawn by the Board, that had it not been for anti-union animus the employer would permit employees to refuse to sign the handbooks, is unsupported by the record in common sense. The handbooks had been in the making for several months. The request that they be signed was made before the union meeting at which the Company discovered who it was that supported the union. All employees were required to sign. The ALJ who heard all the witnesses and whose credibility findings were accepted concluded that the Company's establishment of a penalty for not signing the agreements was consistent with its prior insistence that they sign. The NLRB's conclusion that the discharges were motivated by anti-union animus looks especially unreasonable in light of the fact that two union supporters were allowed, after the emergency union meeting, to sign handbooks under protest. Thus, the NLRB was without substantial evidence to find that the discharge of employees for refusal to sign the handbook violated the Act.
 
 Discharge of Michael Rogers
 
 8
 The NLRB accepted in its entirety the ALJ's conclusion that the Company violated the Act by firing Michael Rogers. Rogers had worked as a full-time employee from the winter of 1986 until the spring of 1987, at which time he was made a part-time janitor at his own request. A requirement of this new position was that he work a minimum of 15 hours per week, although he was never counseled or reprimanded when he failed to work that number of hours. There was some evidence that he may have worked fewer hours for as many as half of the weeks he worked. After a week in which he worked only 5 1/2 hours, he was discharged. Shortly thereafter, however, Rogers was rehired as a full-time employee. While working in this new capacity, he became involved in organizing the union and made a number of pro-union statements in the presence of management.
 
 
 9
 On September 8, Rogers became sick at work. The ALJ found that he was given permission to leave. On September 9, Rogers did not report to work. On September 10, Rogers gave supervisor Scott Shaffer a piece of paper which he asserted was a doctor's excuse. Shaffer stated that it was not sufficient and discharged Rogers.
 
 
 10
 The ALJ found that management was aware of Rogers' union activity and pro-union statements just prior to the union election. Because of these facts and because the Company's "whole defense collapsed by their own admissions," the ALJ concluded that Michael Rogers had been discharged because of his union activities. The Company argues that Rogers was fired for his absenteeism. The ALJ's determination accepted by the NLRB, however, is supported by substantial evidence, especially in light of the fact that the Company admitted that it did not as a matter of course require a doctor's excuse. Deviation from past practice can indicate anti-union motives. NLRB v. Comgeneral Corp., 684 F.2d 367, 370 (6th Cir.1982).
 
 Other Section 8(a)(1) Conclusions
 
 11
 The final issues of contention concern findings by both the ALJ and NLRB that the Company violated Section 8(a)(1) by threatening employees if they unionized. First, the Company contests the ALJ's finding that Tremonti threatened employees during the handbook meetings of May 28, stating that they would lose benefits such as safety shoes, uniforms, and health insurance if they unionized. The ALJ's finding is based on the testimony of multiple witnesses that Tremonti asserted that these benefits would be lost if the employees unionized. While it is plausible that Tremonti was stating what he believed to be fact instead of threatening the employees, the latter interpretation is plausible and is supported by the substantial evidence of several witnesses' testimony.
 
 
 12
 Second, the Company contests the findings by both the NLRB and ALJ that anti-union threats were made by the Company in various conversations involving supervisors Scott Shaffer and Hollis Shaffer in the spring and fall of 1987. With regard to the statements made by Scott Shaffer to employee Joe Freeze, the conclusions reached by the ALJ and accepted by the NLRB are based on the ALJ finding Freeze credible and Scott Shaffer not credible. We can discern no reason why the NLRB could not accept these credibility determinations. Similarly, the issues with regard to the other statements by Scott Shaffer and by Hollis Shaffer come down to which witness is believed, and the ALJ explicitly credited the testimony of the NLRB General Counsel's witnesses over the statements of the Company supervisors, "because it was much more believable than the denials of the Shaffer brothers." The ALJ did not credit witnesses lightly. In the same "Analysis and Conclusions" section of his decision, the ALJ evinces a balanced approach to witness testimony, depending on corroboration and demeanor in crediting some witnesses and discrediting others, without regard to which side the witness favored.
 
 
 13
 Finally, the Company contests the finding by the NLRB, that supervisor Tremonti threatened employee Phillip Rogers in stating that if the union came in, he could make Rogers quit by demoting him to a lower-paying position, thus violating Section 8(a)(1). The Company contends that this finding is in conflict with the finding by the ALJ that Tremonti's statement that if the union came in he could make Rogers an apprentice was not an anti-union threat but a statement of fact. In making its finding, the NLRB stated that it was in addition to, not in conflict with, the ALJ's finding. In light of how closely the two subjects are linked in Rogers' testimony, we find it not possible that the NLRB's finding could not conflict with the ALJ's. We also find, however, that there is substantial evidence to support the NLRB's finding. Looking at the whole of Rogers' testimony, which, with the exception of the statements about demotion, was credited by the ALJ, it is clear that Tremonti was focusing on the union organizing and filled with an anti-union animus when talking with Rogers. In that context, it is certainly not implausible that a statement that he could make an employee quit by demoting him to a lower-paying job, could be an anti-union threat violating Section 8(a)(1).
 
 Conclusion
 
 14
 Having reviewed the NLRB decision and order, the ALJ decision, and the record, we find the findings and conclusions of the NLRB objected to by the Company to be supported by substantial evidence, with the single exception of its finding that the Company's firing of the sixteen employees who refused to sign the handbook violated the Act. Thus, the NLRB's application for enforcement of its order is DENIED in part and its order is ENFORCED in part.
 
 
 
 [1]
 Hereinafter, specific sections of the National Labor Relations Act ("Act"), 29 U.S.C. § 151, et seq., will be referred to simply by the word "Section" followed by the section number